FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | UNDER SEAL |
| | ) | |
| v. | ) | No. 1:18-cr-74 |
| | ) | |
| JOSE MAURICIO CASTAÑEDA GARZON, | ) | Hon. Liam O'Grady |
| | ) | |
| Defendant. | ) | Sentencing: June 28, 2019 |

## DEFENSE POSITION ON SENTENCING

Jose Mauricio Castañeda Garzon was extradited from his native Colombia to this jurisdiction in December 2018. Prior to his extradition, Mr. Castañeda Garzon, a blue-collar mechanic from a rough-and-tumble-neighborhood near the Bogotá airport, had never left Colombia before, much less been to the United States. To say that the experience—the certainty of sanction, the formalism of the American legal system, the isolation of being so far from his family—has been eye-opening for Mr. Castañeda Garzon is an understatement.

But even before setting foot in this Court, Mr. Castañeda Garzon already had begun accepting responsibility for his conduct: He met with law enforcement while in a Bogotá jail, and he sought to speed up, rather than contest, the extradition process. Now here, Mr. Castañeda Garzon has done everything he could to show this Court and the government that he has accepted the gravity of his conduct and intends to put it well behind him as soon as he can. He pled guilty quickly. He has cooperated with the government extensively, the details of which are the subject of the defense's

separately filed Supplement Regarding USSG § 5K1.1. Isolated from his family and everything he knows in Colombia, Mr. Castañeda Garzon would not risk a return to the conduct that led to his extradition. He ardently wishes to return to Colombia to see his family again and, critically, to be part of at least some of his toddler son's childhood.

Given the posture of this case, the Court must consider the 18 U.S.C. § 3553(a) factors as applied to Mr. Castañeda Garzon's case and, separately, consider a reduction to the appropriate sentence under USSG § 5K1.1. The defense submits that when all of these factors are taken into consideration a sentence of 60 months is sufficient and appropriate under the circumstances of this case.

## I. PROCEDURAL BACKGROUND

Mr. Castañeda Garzon was indicted in this Court on February 7, 2018. He was arrested in Colombia in connection with the charges three months later, on April 26, 2018. For the next eight months, Mr. Castañeda Garzon was held in La Picota, a prison in Bogotá, pending extradition proceedings. Notwithstanding that extradition took eight months, Mr. Castañeda Garzon not only did not contest his extradition, he tried to speed up the process by agreeing to a simplified extradition.

On December 19, 2018, he entered U.S. Marshals Service custody and was flown from Bogotá to the Eastern District of Virginia. He made his initial appearance in this Court the next day, December 20, 2018, at which time undersigned counsel was appointed. Mr. Castañeda Garzon did not contest detention.

At the arraignment on January 4, 2019, the case was certified complex. As the

third co-defendant remained in Colombia apparently contesting his extradition, a status conference was set for early March. On February 15, 2019, however, Mr. Castañeda Garzon appeared before this Court and pled guilty to one count of conspiring to distribute cocaine with the knowledge or reasonable belief that it will be imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960 and 963. In doing so, Mr. Castañeda Garzon agreed to cooperate with the United States government. This Court continued the matter for preparation of a pre-sentence report. Sentencing originally was set for June 7, 2019, but at the parties' request this Court reset it for June 28, 2019 to facilitate an additional cooperation opportunity.

## II. LEGAL STANDARD

After *United States v. Booker*, the Sentencing Guidelines range is advisory, and courts must consider it as just one of more than a half-dozen statutory sentencing factors enumerated in 18 U.S.C. § 3553(a).[1] *See* 543 U.S. 220, 259-60 (2005); *see also Kimbrough v. United States*, 552 U.S. 85 (2007) (Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in § 3553(a)); *Gall v. United States*, 552 U.S. 38 (2007) (same). The primary directive in the actual language of § 3553(a) is to "impose a sentence sufficient, but *not greater*

---

[1] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

*than necessary*, to comply with the purposes" of sentencing. (Emphasis added). Therefore, after *Booker*, *Kimbrough* and *Gall*, sentencing courts must impose the minimum sentence that is sufficient to accomplish the objectives of § 3553(a). *See Gall*, 552 U.S. at 41 (reversing Court of Appeals and reinstating a probationary sentence where advisory sentencing range was 30-37 months).

## III. NATURE OF THE OFFENSE

Drug trafficking is widespread in Colombia. In an analysis piece after the guilty verdict in the trial of Joaquín "El Chapo" Guzmán Loera, the New York Times wrote that "[t]here was also testimony that bribes were paid to . . . one of Mexico's top former law enforcement officers, a host of Mexican generals and police officials, *and almost the entire congress of Colombia*." El Chapo Found Guilty on All Counts; Faces Life in Prison, NY Times (Feb. 12, 2019) (emphasis added).[2] Perhaps because it is pervasive, drug trafficking in Colombia takes a more mundane form than what is portrayed in movies and on TV. This case is a good example of how, notwithstanding the quantify of drugs involved, drug trafficking in Colombia is not necessarily organized or profitable.

Mr. Castañeda Garzon was a mid-level broker who tried put deals together by connecting people with drugs to export to people with the means to facilitate exportation. Mr. Castañeda Garzon did not have access to either the money or the drugs: He was a middle-man for those who did, or, even more removed, a middle-

---

[2] Available online at <https://www.nytimes.com/2019/02/12/nyregion/el-chapo-verdict.html>.

man for those who knew those who did. He hoped to earn a commission from deals he helped put together if the transactions he brokered were successful.

As Mr. Castañeda Garzon understands it, his co-defendant Mr. Avila-Acevedo did have connections to the drugs and the money. Mr. Castañeda Garzon had known Mr. Avila-Acevedo for years. In approximately 2017, Mr. Avila-Acevedo sought a way to move quantities of cocaine out of the ports along Colombia's northern Caribbean coast, including from the town of Santa Marta. To do that, Mr. Avila-Acevedo needed a contact inside the port who could, for a fee, ensure the shipments cleared customs for departure. Mr. Avila-Acevedo asked Mr. Castañeda Garzon to help him identify a suitable candidate. Mr. Castañeda Garzon combed his contacts to find someone who could lead him to a prospective insider at the Santa Marta port. His search led him to Major Leyton-Vargas, an officer of the Colombian Air Force who worked for the Department of Defense. In exchange for payment, Major Leyton-Vargas was able to connect Mr. Castañeda Garzon and Mr. Avila-Acevedo to a willing Santa Marta port inspection officer. In exchange for payment, the port officer agreed to ensure that cocaine shipments secreted in shipping containers made it out of the port. Mr. Castañeda Garzon later learned the port officer was working with U.S. law enforcement.

All told, this arrangement resulted in four large shipments of cocaine. Every shipment was interdicted, either at the port in Santa Marta or when it arrived at its destination. Two shipments, one bound for Guatemala, one bound for Mexico, were

interdicted before they left the Santa Marta port. Two additional shipments sailed for Europe and were interdicted upon arrival.

Mr. Castañeda Garzon did not know or personally have access to the person or people supplying the cocaine nor those paying for it. He did not have control over the size of the shipments, nor their destination. He did not actually arrange for the shipments themselves. Instead, he was a go-between among the various individuals involved in arranging the shipments. Occasionally, Mr. Castañeda Garzon carried payments between members of the conspiracy or arranged for gifts for the port inspection officer. Though Mr. Castañeda Garzon expected to earn a commission for his role in finding a port contact, the commission never materialized since all of the shipments were intercepted.

## IV. SENTENCING ARGUMENT

Mr. Castañeda Garzon respectfully submits that a sentence of 60 months is appropriate in this case for at least the following four reasons and those addressed in the parties' separately filed addenda pursuant to USSG § 5K1.1.[3] First, as discussed above, this case is not aggravated—no drugs hit the streets anywhere, much less in the U.S. (nor could they have, given law enforcement monitoring), and no violence is

[3] It is undisputed that Mr. Castañeda Garzon meets the five-pronged test for safety valve eligibility under § 3553(f). *See* PSR ¶ 52 (assessing 2-point decrease for safety valve eligibility). That said, given the government's motion pursuant to USSG § 5K1.1, which also permits the Court to set aside the statutory mandatory minimum, § 3553(f) may not have much of a role to play in this case. Nevertheless, the defense submits that Mr. Castañeda Garzon's eligibility for safety valve is a relevant consideration in the § 3553(a) analysis.

alleged. Second, Mr. Castañeda Garzon is a working class laborer who had a mid-level role in a wider conspiracy—he had no control over the amount and destination of the drugs, and never earned his expected commission. While Mr. Castañeda Garzon agrees the shipments were large, it is a testament to the drug trade in Colombia that these amounts were involved in a run-of-the-mill drug conspiracy with no apparent signs of cartel involvement and no violence. Third, the applicable Sentencing Guideline is an unreliable metric in this particular case. And, fourth, this Court should account for the fact that a period of incarceration has a significantly weightier impact on an extradited defendant like Mr. Castañeda Garzon than in the average case.

**A. Mr. Castañeda Garzon grew up poor in an environment in which it was not uncommon to try to eke a livelihood from his country's drug trade.**

Mr. Castañeda Garzon grew up in Bogotá's working class Fontibón neighborhood. As Mr. Castañeda Garzon tells it, the neighborhood's primary claim to fame is its proximity to the city's international airport, El Dorado. Many of his neighbors and friends work at or have worked at the airport. When he was 16 years old, Mr. Castañeda Garzon began working night shifts for tips guarding cars parked at El Dorado. He moved on to cleaning airplanes, later working as ground grew on the tarmac and helping perform airplane maintenance.

Mr. Castañeda Garzon's father was a bus driver. His mother stayed home with Mr. Castañeda Garzon and his seven siblings. In their neighborhood, running water and indoor plumbing were not laid until Mr. Castañeda Garzon was a teenager. But, though Mr. Castañeda Garzon grew up poor, his basic needs were met and he had the

fortune of a big, loving family. He made it through eighth grade in school before leaving to start working.

When he was 23 years old, Mr. Castañeda Garzon married Mary Luz Romero Sierra. They have two adult children, a son, Fabian, born in 1993, and a daughter, Triny, born in 1995, and a continuing, strong relationship. Mr. Castañeda Garzon's mother died in 1995, an event that shook his whole family. His daughter is named Triny after his mother. In Ms. Romero Sierra's words, Mr. Castañeda Garzon "is a good man, the best husband and father in the world." *See* Ltr. of Mary Luz Romero Sierra (attached as part of Exhibit B). Mr. Castañeda Garzon's children describe him as having taught them the importance of being and doing good in the world. *See* Ltr. of F. Castañeda Romero (attached as part of Ex. B) ("he has always counseled and guided me to be a good human being, a person who is useful to society").

Mr. Castañeda Garzon also has a 23-month old son, Dylan, by a former girlfriend. By all accounts, Mr. Castañeda Garzon is devoted to Dylan, taking him with him wherever he goes when they are together. *See* Ltr. of J.M. Castañeda Garzon (attached as Exhibit A); Ltrs. of family & friends (Ex. B). It is a testimony to Mr. Castañeda Garzon's good nature that, though Dylan was born out of wedlock, the whole family, including Ms. Romero Sierra and Mr. Castañeda Garzon's adult children, love and accept Dylan, and yearn for the little boy to have his father back. *See* Ltrs. of T. Castañeda Romero & M. Romero Sierra (attached as part of Ex. B).

After Mr. Castañeda Garzon and Ms. Romero Sierra married, Mr. Castañeda Garzon started a bus painting company and repair shop. The company flourished

and Mr. Castañeda Garzon reports that, for a time, busses painted by his shop were well-known around Bogotá. But, when the city took over the bus service, the need for individually recognizable painted busses dried up and so did Mr. Castañeda Garzon's business. This began a less stable period in Mr. Castañeda Garzon's employment history, which, unfortunately, coincided with his children going to school.

In Fontibón, Mr. Castañeda Garzon knew many people who had connections to drug-trafficking. In large part, he explains, this is a function of the airport's proximity and the many neighborhood residents who work there or have connections there. He met and became friends with Mr. Avila-Acevedo because they grew up together in the neighborhood. As Mr. Castañeda Garzon describes it, people he knew were always trying to make a deal to move a drug shipment, large or small, out of the country to earn a little extra money. That did not mean that these people had access to money or drugs, much less that they were major drug traffickers. Rather, they were, as Mr. Castañeda Garzon was, middlemen looking to put a deal together in the hopes of earning a commission. If they knew someone looking to move cocaine out of the airport and also knew someone who worked at the airport who could facilitate that shipment, they might connect those two people in return for a fee. Mr. Castañeda Garzon was able to supplement his livelihood this way. Thus, Mr. Castañeda Garzon became involved in drug trafficking—in the same way that someone in the United States might start selling drugs to support his family because it is an opportunity available in his neighborhood when other opportunities are lacking. It helped pay the bills, but it did not afford much more than that.

When Mr. Avila Acevedo came to Mr. Castañeda Garzon looking for help making a connection at the Santa Marta port in about 2017, Mr. Castañeda Garzon was hopeful that he would earn a decent commission if he was successful. The primary task—making a connection to a port official at a relatively small port on the Caribbean coast—did not obviously portend legal jeopardy in and extradition to the United States. And, by then, Mr. Castañeda Garzon's older children were already out of the house, and Dylan was not yet in the picture. It was easy for Mr. Castañeda Garzon to overlook the significance of what he was getting into.

**B. The drug trafficking Guideline is not empirically based and does not accurately reflect the conduct at issue.**

While there is no dispute about the advisory Guidelines range applicable here, the Guideline, USSG § 2D1.1, should be discounted in a case like this. The Guideline is not empirically based and overemphasizes drug type and quantity, which were meant to stand as metrics for culpability. But here, where drug type and quantity are outside of the defendant's control, drug type and quantity are "poor proxies for culpability." *United States v. Diaz*, No. 11-CR-00821-2, 2013 WL 322243, at *1 (E.D.N.Y. Jan. 28, 2013).

Congress originally intended the mandatory minimum drug sentences to correspond to the roles of various offenders—5 years for managers and 10 years for organizers and leaders, *see id.* at *4 n.34, but ended up with statutes tied to the type of drug and its quantity, *see id.* at *5. As a result, the Guidelines do the same, relying on drug type and quantity, structured to maintain consistency with the statutory mandatory minimums. *See id.* at *6. This has resulted in a sentencing scheme

divorced from Congress' original intention to target the most culpable offenders for the most severe sentences. *See, e.g., Kimbrough v. United States*, 552 U.S. 85, 95 (2007) ("The [Anti-Drug Abuse] Act uses the weight of the drugs involve in the offenses as the sole proxy to identify 'major' and 'serious' dealers.").

Courts are entitled to reject or vary from the guidelines based on policy disagreements, "even in a mine-run case, and not simply based on an individualized determination that it yields an excessive sentence in a particular case." *See, e.g., Spears v. United States*, 555 U.S. 261, 262 (2009). In fact, courts have regularly imposed below-guideline sentences in drug trafficking cases for reasons other than a government request, particularly in powder cocaine cases. *See* U.S. Sent. Comm'n, Quick Facts – Drug Trafficking Offenses (July 2018) (below guidelines sentence for reasons other than government request imposed in nearly 25 percent of cases);[4] U.S. Sent. Comm'n, Quick Facts – Powder Cocaine Trafficking Offenses (July 2018) ("rate of non-government sponsored below range sentences for powder cocaine traffickers has generally increased in recent years, from 20.9% in fiscal year 2015 to 24.3% in fiscal year 2017").[5]

The defense submits that this Court should afford the advisory Guideline range substantially less weight than usual in the § 3553(a) calculus because § 2D1.1

---

[4] Available online at <https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Drug_Trafficking_2017.pdf>.

[5] Available online at <https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Powder_Cocaine_FY17.pdf>.

does not effectively correlate to the intended metric, culpability, in cases like this in which the defendant has no say in drug type and quantity.

### C. The Sentencing Guidelines do not adequately account for important differences between the ordinary defendant and a defendant who has been extradited.

Mr. Castañeda Garzon's case should be viewed in a different framework than the ordinary defendant because he was brought to the United States for the sole purpose of prosecution. His posture as an extradited defendant matters for two reasons: First, extradition itself is recognized as an effective and powerful deterrent, mitigating the need to impose a lengthy prison term for deterrent effect. Second, incarceration is objectively harsher for an extradited defendant than the average defendant with family or other ties here, or who committed their offense in the U.S. or targeted U.S. citizens.

It is well-recognized that a *purpose* of extradition is deterring crime. Indeed, the Department of Justice itself touts the efficacy of extradition as a deterrent. *See, e.g.*, DOJ Press Release (April 19, 2019) ("Today's extradition should serve as a strong deterrent to anyone considering taking part in similar scams, and I hope it provides a sense of justice for the victims as well." (quoting ICE Executive Associate Director Derek N. Benner)); DOJ Press Release (May 20, 2016) ("This arrest and extradition serves a strong deterrent to those targeting the computer networks of US companies and US citizens." (quoting FBI Special Agent in Charge, J. Britt Johnson, FBI Atlanta Field Office)).[6] *See also, e.g.*, Rep. Deal, Opening Statement to Subcommittee on

[6] Available online at <https://www.justice.gov/opa/pr/indian-national-extradited-

Criminal Justice, Drug Policy and Human Resources (Oct. 1, 2003) ("Colombia has recognized that extradition to the United States is one of the most effective deterrents it possesses in fighting organized drug activities.");[7] Sen. D. Feinstein, Address to Congress (2001) ("many of us who have worked in this area for years believe extradition is a major deterrent to the cartel leadership").[8]

Achieving deterrence is an important purpose of sentencing. *See* 18 U.S.C. § 3553(a). In a case like this one, extradition effects deterrence even before a sentence is imposed. Thus, the Court need not place as much emphasis on deterrence in selecting an appropriate sentence.

Further, that Mr. Castañeda Garzon was extradited from his home country is relevant to the "just punishment," "respect for the law," and rehabilitative factors of § 3553(a). Mr. Castañeda Garzon was brought to the United States by legal action of the U.S. government for the sole purpose of prosecution. He did not specifically act to harm U.S. citizens. He knows no one here. His family, who are working class, remain in Colombia. As a result, unlike most federal defendants, Mr. Castañeda Garzon will not see his family again until he completes whatever prison term this Court imposes. Even if Mr. Castañeda Garzon's family could afford to travel to the

---

united-states-face-charges-leadership-role-multimillion-dollar>.

[7] Available online at <https://www.govinfo.gov/content/pkg/CHRG-108hhrg92899/html/CHRG-108hhrg92899.htm>.

[8] Available online at <https://www.govinfo.gov/content/pkg/CRECB-2001-pt12/html/CRECB-2001-pt12-Pg16547-2.htm>.

United States, they would have to seek and obtain a visa to enter the country—a step likely out of their reach.

Mr. Castañeda Garzon's isolation from his family is a significant factor for this Court's consideration. *See* Ltr. of J.M. Castañeda Garzon (Ex. A); Ltrs. of family & friends (Ex. B). The family contact that Mr. Castañeda Garzon lacks is well-recognized as an important source of support and rehabilitation for inmates, so much so that it is codified in federal law, *see* 18 U.S.C. § 3621(b). Indeed, Congress reemphasized the importance of inmates retaining family contact when, the day after Mr. Castañeda Garzon first appeared in this Court, it passed legislation fortifying the Bureau of Prisons' obligation to place inmates as close as practicable to their homes. *See* First Step Act of 2018, S. Bill 756, Sec. 601 (signed on Dec. 21, 2018, amending 18 U.S.C. § 3621(b) to include 500 driving mile guidance).

Obviously such measures do not help defendants who come from abroad. Because they do not, the U.S. government developed the international prisoner transfer program ("IPTP"). The IPTP came into being because, in the government's words, "there was a fundamental belief that the rehabilitative prospects of a prisoner were strongest if the prisoner was located near his home where he could be close to family and friends, in a familiar culture, and in a place where his native language was spoken." Dept. of Justice, Int'l Prisoner Transfer Program, Impetus for the Program.[9] But Colombia is not a participant in the IPTP, so Mr. Castañeda Garzon will not be eligible for a transfer home to serve any period of his sentence. He will,

---

9 Available online at <https://www.justice.gov/criminal-oia/impetus-program>.

thus, suffer the isolating effects of imprisonment away from the cultural and family supports that the U.S. government itself recognizes as important.

Mr. Castañeda Garzon's status will affect most aspects of his incarceration. Not only will he not see his family again for a period of years. He will not be eligible for release to a halfway house. He will likely be detained by ICE for some period of time after he completes his sentence while the government processes his removal. The isolation will infiltrate even relatively minor aspects of Mr. Castañeda Garzon's time in custody. For example, his family has not been able to put money on his commissary account due to the complexities of distance and the lack of a proxy in the U.S. to do it for them. *See* PSR ¶ 92 (reporting that Mr. Castañeda Garzon has $0.11 on his jail account). Though it would be easy to dismiss the fact that he cannot buy coffee or long-sleeved t-shirts when the weather turns cold as discomforts attendant to being in prison, punishment is not the sole goal of sentencing. Rather, § 3553(a) focuses also on identifying a "just punishment," "promot[ing] respect for the law," and providing for rehabilitation. The hardships attendant to Mr. Castañeda Garzon's imprisonment isolated from his family and home country do a disservice to these sentencing factors and, therefore, should be considered when determining what period of imprisonment actually is necessary.

**D. The Need to Impose a Sentence that Achieves Deterrence and Promotes Respect for the Law**

A sentence of 60 months, with credit for time served including while awaiting extradition, is a significant sanction when coupled with the other penalties Mr. Castañeda Garzon will experience as a result of this prosecution. By itself, five years

imprisonment is a lengthy period to be removed from society. It is even more so when it means the defendant will not see his family for the duration of that period. Mr. Castañeda Garzon has a toddler son, who will turn two years old before sentencing. Missing these precious years of his son's life is a particularly painful consequence of Mr. Castañeda Garzon's poor decision-making—unforeseen at the time of the conduct, which began more than two years ago.

Furthermore, this was not a violent offense, nor one with any identifiable victim.[10] It was not even a successful offense. Had law enforcement intervened at the outset, there would have been one, rather than four, failed shipments. Even more importantly, Mr. Castañeda Garzon is not a high-level player in the context of Colombian drug trafficking. Though the shipments were large, Mr. Castañeda Garzon had no control over their size. He did not know the sources of the money or the drugs. He was not a member of a cartel, or any other sort of well-organized drug trafficking outfit. His role was to connect one participant in Colombia's diffuse drug trafficking network with another participant. Rather than being a flashy, money-making narco-trafficker, Mr. Castañeda Garzon was a blue-collar broker hoping to earn a commission that never panned out.

That the U.S. government can and *would* reach into Colombia to arrest a mid-level broker like Mr. Castañeda Garzon is eye-opening and, alone, ample deterrent

[10] Although this offense has no victims, Mr. Castañeda Garzon recognizes that the conduct is still dangerous. *See* Ltr. of J.M. Castañeda Garzon ("I am aware that the crime I committed put society in danger and I did not measure the consequences of the global impact that illicit drugs have." (translation)).

against future criminal conduct. Ltr. of J.M. Castañeda Garzon (Ex. A) ("I do not know why these things that are so hard have to happen in order to reflect and for one to see life in another way, that is why I promise to change to do my best for society."). Indeed, as discussed that is one *point* of extradition. It is one thing to risk prison in one's own country; it is quite another to open oneself up to being removed to an unfamiliar country and largely cut off from family and friends. *See* Ltr. of J.M. Castañeda Garzon (Ex. A) ("[T]he yearning I have to be with my children and family is huge and what is most painful is that I don't know how long I must wait to see and hug them again. This is one of the biggest reasons to no longer commit any crimes.").

Mr. Castañeda Garzon is already 51 years old. He is, therefore, statistically less likely to reoffend than most other categories of drug trafficking offenders. *See* U.S. Sentencing Comm'n, Recidivism Among Federal Drug Trafficking Offenders, at 20 Fig. 2.15 (Feb. 21, 2017) ("USSC Recidivism Study").[11] The Sentencing Commission has studied and recognized that less time is needed to achieve deterrence for older offenders such as Mr. Castañeda Garzon.

Even the Department of Justice agrees that a longer sentence does not necessarily make for a stronger deterrent; rather, it is the certainty of being caught and punished that is most effective. *See* USDOJ, Nat'l Inst. of Justice, Five Things About Deterrence (June 6, 2016).[12] *See also* USSC Recidivism Study at 19 Fig. 2.14

---

[11] Available online at <https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview>.

[12] Available online at <https://nij.gov/five-things/pages/deterrence.aspx>.

(recidivism rates consistently rise as term of incarceration lengthens).[13] This is even more so when that certainty includes years of separation from one's country and family. Mr. Castañeda Garzon recognizes that drug-trafficking is an ill that inflicts harm. *See* Ltr. of J.M. Castañeda Garzon (Ex. A). In the context of his home country and upbringing, Mr. Castañeda Garzon's decision to engage in drug trafficking was an economic choice among limited options never appreciating the seriousness of the consequences he could face. He has now resoundingly learned how serious those consequences are.

## V. CONCLUSION

For the foregoing reasons as well as those discussed in the contemporaneously filed supplemental memoranda, Mr. Castañeda Garzon respectfully requests that this Court impose a sentence of 60 months of imprisonment and credit him with the time he has served since his arrest in Colombia on these charges. Additionally, Mr. Castañeda Garzon requests that this Court recommend that the BOP place him in a facility as close to Miami, Florida as possible.

Respectfully submitted,

JOSE MAURICIO CASTAÑEDA GARZON

By Counsel,
GEREMY C. KAMENS
Federal Public Defender

/s/ Cadence Mertz

[13] Available online at <https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170221_Recidivism-Drugs.pdf>. The study looked at a pool of U.S. citizen offenders. *See id.* at 9 Fig. 2.1.

Cadence A. Mertz
Va. Bar No. 89750
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800 (T)
(703) 600-0880 (F)
Cadence_Mertz@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2019, I will file the foregoing pleading with the Clerk of the Court and serve copies on counsel of record.

/s/ Cadence Mertz
Cadence Mertz
Va. Bar No. 89750
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800 (T)
(703) 600-0880 (F)
Cadence_Mertz@fd.org